Upon a Rehearing En Banc
Upon a Petition for a Writ of Actual Innocence
Dustin Allen Turner petitioned this Court for a writ of actual innocence based upon newly-discovered, non-biological evidence, pursuant to Chapter 19.3 of Title 19.2 of the Code of Virginia, alleging that his 1996 convictions for the abduction with intent to defile and murder of Jennifer L. Evans should be vacated because in 2002 Billy Joe Brown, who was convicted of these same crimes,[1] confessed that he acted alone in killing Evans. This Court remanded the matter to the circuit court to certify findings regarding factual issues in dispute. *397 The circuit court conducted a hearing in this matter and supplied this Court with its certified findings of fact, including its finding that Brown was “credible in his assertion that he acted independently in murdering the victim and ... Turner played no role in the murder or in the restraining of the victim.”
A divided panel of this Court held that Turner met his burden of proving, by clear and convincing evidence, that the recantation was truthful and that, had the statement been produced at trial, “no rational trier of fact could have found proof of guilt [of felony murder and abduction with intent to defile] beyond a reasonable doubt[,]” granted his petition for a writ of actual innocence, vacated Turner’s convictions for first-degree murder and abduction with intent to defile, and remanded the matter to the circuit court with instructions to modify the order of conviction to reflect Turner’s conviction for being an accessory after the fact. See Turner v. Commonwealth, 54 Va.App. 458, 680 S.E.2d 312 (2009). We granted the Commonwealth’s petition for rehearing en banc and stayed that order.
On rehearing en banc, we hold that Brown’s credible recantation does not provide this Court with clear and convincing evidence that no rational fact finder could have found that Turner used deception to abduct Evans with the intent to have sexual intercourse with her against her will. Therefore, we dismiss Turner’s petition for a writ of actual innocence and vacate the August 4, 2009 order issued by a panel of this Court.

I. Background

On June 18, 1995, Brown, a Navy SEAL trainee, spent much of the day drinking. Over the course of the day, Brown consumed six beers and eight to ten shots of Jim Beam in his room at the barracks. That night, Brown decided to go to a Virginia Beach nightclub called The Bayou with Turner, a fellow trainee. While Turner drove to the nightclub, Brown drank six more beers.
*398 That same night, Jennifer Evans, who was vacationing in Virginia Beach with her Mends, Michelle McCammon and Andria Burdette, decided around 11:00 p.m. to go to The Bayou. While at the nightclub, Evans noticed Turner, whom she had not previously met, and began talking with him. Throughout the remainder of the night, she alternated between socializing with her Mends and speaking with Turner. Though Evans met Brown briefly, she did not spend time talking with him.
Around midnight, Burdette wanted to leave, but Evans stalled to continue talking with Turner. Turner and Evans appeared to be getting along very well, so well that at one point Turner sat in a chair while Evans perched on the armrest. About an hour later, Evans finally agreed to leave but not before writing the phone number at the home where she was staying on a napkin for Turner.
Burdette and McCammon then left the nightclub with Turner and Evans trailing behind. As the women entered their vehicle, Turner leaned against the back door and continued talking to Evans through the open window. Turner offered to drive Evans home, but Burdette refused. Burdette and McCammon eventually agreed to leave Evans at the nightclub and return at 2:00 a.m. to take her home. After this agreement was reached, Turner opened Evans’ door with “surprising force.” Evans appeared happy with this arrangement and returned to the nightclub with Turner.
Around 1:15 a.m., Turner approached Karen Bishop, Brown’s ex-girlMend, and asked her to give Brown a ride home if Turner did not return to the bar before it closed. Bishop reluctantly agreed. Between 1:15 and 1:30 a.m., the lights came on signaling that it was almost closing time. After the lights came on, Julio Fitzgibbons, a Navy SEAL who had met Brown and Turner that night, approached Turner to see whether Turner had any plans for that night.[2] Turner said *399 that he and Brown were going to have a threesome with Evans. Evans was approximately fifteen yards away at this time. Within a few seconds of this, Evans approached and Turner introduced her to Fitzgibbons as she stood next to Brown. Fitzgibbons then gave them the thumbs up sign, which Turner returned with a smile on his face.
At approximately 1:35 a.m., Bishop saw Turner and Evans, who were holding hands, leave the nightclub. Brown was with Bishop and one of her friends at this time. At approximately 1:45 a.m., Brown indicated that he wanted to leave, but Bishop told him that she needed to wait a few minutes for her friend.
Brown had consumed an additional eight to ten beers, eight to ten shots, and twelve mixed drinks while at the nightclub. He was noticeably intoxicated and on the verge of losing consciousness.
Brown, indicating an unwillingness to wait for Bishop’s friend, left the nightclub. Bishop followed him out of the bar at approximately 1:50 a.m. and told him that she would wait for a few minutes to give him a ride home in case he was unable to find Turner. Around 2:10 or 2:15 a.m., Bishop went back inside the bar, found her friend, and went to her car. Bishop and her friend drove around the parking lot looking for Brown but left after not seeing him.
When Burdette and McCammon returned to the nightclub at approximately 1:50 a.m., Evans was not in the parking lot where she had promised to meet them. They searched for several hours but could not find Evans. The women filed a missing persons report with the police the next day. After reading about Evans’ disappearance, Bishop contacted the police to tell them that she had seen Turner and Brown with Evans on the night Evans disappeared.
At approximately 9:00 p.m. on June 21,1995, Special Agents Thomas L. Carter and Robert Elliott of the Federal Bureau of Investigation interviewed Turner to try to determine what Turner did the weekend Evans disappeared. Notably, Turner told the agents that on Sunday night, he and Brown went to The Bayou where they stayed until closing time before re *400 turning to the barracks by themselves. When asked for more details, Turner said he had a conversation with some other SEAL trainees that he met there. He also told the agents that he met two women that evening: one was a tall woman whose name he could not recall and the other was a woman, who the agents later learned was Evans, who was at the nightclub with two female friends. The agents specifically asked Turner about the second woman, and he said he could not recall her name but that they talked for a while. He said that her two companions decided to leave and return around closing time to pick her up. Turner said he continued to talk with her for a while before he left to speak with other people that he knew. He told the agents that he spoke to her again around last call. The woman told him that she would be there for the week and wanted him to call her. She wrote her name and phone number on a cocktail napkin for him. Turner said that he and Brown left while she was waiting for her friends.
After the agents suggested several possible names for the woman, Turner said he might be able to provide her name because he thought that he still had the cocktail napkin in his barracks. Then, Turner and Special Agent Elliott went to Turner’s barracks so that Turner could retrieve the napkin. The napkin had the name Jennifer and a phone number written on it.
Once the agents verified that Turner had spent time with Evans, they continued to question him about her, and he repeated that he had met her and her friends at the bar. He told the agents that at some point in the evening, he believed that Evans might agree to leave the bar with him. Based on this belief, he asked Brown to ride home with Bishop so that he was free to leave with Evans. Turner said that Brown told him that he did not want to ride home with Bishop. Turner told investigators that when he realized that he would not be able to be alone with Evans that night, he told her that he would try to contact her later in the week. He stated that he left Evans standing at the bar and returned to the barracks with Brown. Turner told the investigators that neither man had been drinking. He stated that they woke up around 9:00 *401 a.m. on Monday and jointly signed a lease on an apartment before driving back to the base. During the entire interview, the agents thought that Turner was very calm and collected and that his answers seemed very forthright.
Sergeant Thomas Baum, a member of the Virginia Beach Police Department’s homicide unit, participated in a subsequent interview of Turner at FBI headquarters in Richmond, Virginia. During that interview, Turner said he and Brown went to The Bayou, where he saw some other SEALS and spent most of the night talking with one of them, a Mexican or Puerto Rican man whose name Turner did not know. Turner also said that Bishop and one of her friends were there. He said he didn’t start talking to Evans until around midnight or 12:80 a.m. Turner told the sergeant that he introduced himself to Evans while she was standing with her friends. Turner said they spoke for only a few minutes before he returned to Brown and the other SEALS.
Turner told Sergeant Baum that he resumed talking with Evans around 1:00 a.m. while her friends were still there. Soon, her friends wanted to leave, so he walked the women to their car. Evans sat in the back seat, but the door was not closed. He said that he told Evans and her friends that they should stay because the nightclub closed in one hour. Evans agreed to stay, and her friends agreed to pick her up in front of The Bayou at closing. He said that he and Evans returned inside to talk as her Mends drove away. When the lights came on in the nightclub, he asked Evans for her number. Turner told Sergeant Baum that he spoke with Evans for a few more minutes before returning to Brown. He said that he saw Evans talking with two unknown men. Turner told Sergeant Baum that he and Brown left around 1:45 or 2:00 a.m. without Evans.
Shortly after Sergeant Baum finished interviewing Turner, Detectives John T. Orr and Al Byrum, also of the Virginia Beach Police Department, interviewed Turner. The detectives noticed that as they did so, Turner’s original story began to change and “his denials became weaker and weaker.” *402 Eventually, Turner said that he would speak to the detectives after he talked with his chief warrant officer. After allowing him to do so, the detectives asked Turner where they could find Evans’ body, and Turner agreed to take them to it. In response to direct questioning, Turner stated that he was not the person who killed Evans but that he was present when Brown killed her in Turner’s car. He explained that Brown choked Evans until she was dead while they were in the parking lot of The Bayou. Turner agreed to provide police with his car and clothing from that night.
When Brown was interviewed, he told investigators that Turner spent the entire night talking with Evans but that Brown was not interested. Brown stated that Turner indicated that he was “hooking up” with Evans, and he confirmed that Turner had arranged for Bishop to give Brown a ride home. Brown did not want a ride home from Bishop because he was concerned that he would have sexual intercourse with her and that would ruin his current relationship. Brown said that when he left the nightclub and headed out into the parking lot, he saw Turner jump out of his car and order Brown to get into the car. Brown saw Evans laying in the backseat with blood coming out of her nose and her clothes torn open. According to Brown, Turner told him, “I think I fucking killed her.” Turner then implemented a plan to dispose of Evans’ body and cover up the murder.
Turner’s trial for murder and abduction with intent to defile began in August of 1996. Charlotte Lowe, the forensic supervisor who analyzed the crime scene, testified that Evans’ body was in an advanced state of decomposition and skeletalization, such that many of her bones were exposed. The vest Evans had been wearing on the night she disappeared was pulled back and her bra was pushed up, exposing her breasts. Her shorts and underwear had been pulled down so that they were around only one leg. Lowe examined Turner’s vehicle for semen, urine, fingerprints, and other physical evidence but found nothing of forensic value in the vehicle.
*403 Dr. Leah Bush, Assistant Chief Medical Examiner for the Commonwealth of Virginia in the Tidewater district, performed the autopsy on Evans’ body and opined that it was impossible to determine Evans’ exact cause of death due to the severe skeletalization but concluded that manual strangulation was a possibility. Dr. Bush described the various chokeholds that could have led to Evans’ death and how long each method would likely take to have killed her. Dr. Bush conclusively ruled out a broken neck as a cause of death because Evans’ spinal cord did not show signs of fracture.
Todd Ehrlich, a Navy SEAL who completed some training with Brown and Turner, also testified against Turner. He told the jury about Turner and Brown’s reputations for engaging in group sexual encounters.[3] Specifically, he testified that he recalled seeing the two men socializing with two women on June 16, 1995. According to Ehrlich, Turner alternated between talking to one of the young women and then talking to Brown to give him a “progress report.” He could not recall the specifics of the conversation between Turner and Brown but said it involved the two of them attempting to get the young women to go home with them. Ehrlich testified that the two women left together without Turner and Brown. Ehrlich further testified about an incident where he witnessed Brown and Turner engage in group sexual intercourse with a woman while the three were stationed in California. Ehrlich told the jury that he later had a conversation with Turner and Brown in which they bragged about repeating the group sexual intercourse with that woman.
Turner took the stand in his own defense and declared that he never intended to have sex with Evans. According to Turner, his original plan was to take Evans to the beach to continue talking. He testified that he abandoned that idea because it would have been impossible to do so and still return by 2:00 a.m. to meet Evans’ friends. Turner testified that, instead, he and Evans went to his vehicle to wait for Evans’ *404 friends. While waiting, Turner saw Brown approach and told Evans to “pay no attention to this guy. He’s drunk. Don’t believe a word he says.” Brown then entered the vehicle and sat in the back seat directly behind Evans.
Brown began cursing and making belligerent remarks about Turner and Bishop. Although Turner stated that he could not remember many details of the night, he recalled that Brown shifted his attention towards Evans and began making crude remarks to her. Specifically, Brown asked her whether she was a virgin and whether she had ever had sex with a “frogman.” Out of the corner of his eye, Turner saw Brown touch Evans, and she slapped his hand away. At that moment, Turner saw Brown reach around and make a jerking motion with both arms. According to Turner, Brown had both arms locked around Evans’ neck and was making a squeezing motion. Turner testified that he tried to pry Brown’s arms from her neck but could not. After a minute, Brown let go, and Turner checked Evans’ vital signs but could not find a pulse. Brown yelled at Turner to drive, and Turner complied.
As Turner drove away, Brown reached beneath Evans’ shorts until Turner yelled at him to stop. Brown then passed out. Turner drove to a secluded area near some woods where he and Brown removed Evans’ body from the vehicle. Turner went back to the vehicle to look for a shovel, and when he returned, he found Brown lying on top of Evans’ body. Turner pulled Brown off, and Brown said, “It doesn’t matter because I couldn’t get it—a hard on anyway.” They left after covering Evans’ body with leaves. Before returning to the military base, they went to a diner. The next day, Turner and Brown signed a lease to be roommates for the coming year.
In response to Ehrlich’s testimony about group sexual intercourse in California, Turner stated that “it all centered] around one incident and bragging about that one incident.” He confirmed talking to Fitzgibbons on the night of June 18, 1995, but he denied talking about engaging in a threesome with Brown and Evans. Turner reiterated that he “did not *405 actively try to sleep with [Evans]” because “she wasn’t that type of girl at all.”
On September 5, 1996, the jury, after having been instructed on the legal theories of concert of action as well as principal in the first and second degrees, found Turner guilty of abduction with intent to defile, in violation of Code § 18.2-48, and murder, in violation of Code § 18.2-32. The trial court imposed a prison sentence of 82 years. Both this Court and the Supreme Court of Virginia denied Turner’s petitions for appeal.
On July 2, 2002, Brown, who did not testify at Turner’s trial, provided a tape-recorded interview in which he avowed that he had lied to investigators about Turner’s involvement in Evans’ death and testified falsely about those events at his own trial. Brown stated that he spontaneously choked Evans and then blamed Turner because Turner had betrayed him by telling investigators what happened and where Evans’ body was hidden. On February 28, 2003, Brown signed an affidavit that memorialized this interview.
Based on Brown’s affidavit, Turner filed a petition for a writ of actual innocence based upon newly-discovered, non-biological evidence. In his petition, Turner relied upon Brown’s 2002 admission and 2003 affidavit in which Brown stated that he alone killed Evans and that Turner played no part in it. Turner asserted that other evidence in the record supported Brown’s statement absolving Turner. The Commonwealth filed a motion to dismiss Turner’s petition, alleging that the petition was without merit because Brown’s confession was not credible and even if it was credible, the other evidence against Turner was sufficient to find him guilty either as a principal in the second degree or under the felony-murder doctrine.
Upon consideration of Turner’s petition, the Attorney General’s motion to dismiss, Turner’s reply thereto, and the record, this Court denied the motion to dismiss and remanded the matter to the circuit court to certify findings of fact *406 regarding factual issues in dispute.[4] Specifically, this Court instructed the circuit court to answer four questions:
1) whether Brown’s recanted testimony is credible in his assertion that he testified falsely at his own trial,
2) if the answer to Question # 1 is “yes,” did Brown testify falsely as to any material fact,
3) if the answer to Question # 1 is “yes,” was Brown’s recantation testimony unknown or unavailable to the petitioner or his counsel at the time the conviction became final, or could such recantation testimony, through the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction, [and]
4) is Brown credible in his assertion that he acted independently in murdering the victim and that Turner had no role in the murder or any restraint of the victim?[5]
*407 On May 28, 2008, the circuit court conducted an evidentiary hearing in which Brown testified that on the night of June 18, 1995, he did not want to engage in sexual intercourse and purposefully consumed excessive amounts of alcohol. He stated that he recalled briefly talking to Evans and claimed he did not know Turner’s intentions concerning Evans aside from Turner’s wanting to spend more time with her. Brown confirmed Turner’s prior testimony that Bishop was to give Brown a ride home but that Brown did not want to wait for Bishop’s friend to arrive. Brown admitted that, by this point, he was extremely intoxicated and on the verge of passing out. He testified that he found Turner’s vehicle and climbed into the back seat behind Evans. Brown recalled saying something vulgar but could not remember specifically what he said. Brown testified that “one minute [he] was normal and the next minute [he] snapped and [he] started choking [Evans,]” by putting his left arm against her neck and holding it with his right arm.[6]
*408 Brown testified that when he realized that Evans was dead, he instructed Turner to drive. He further told the circuit court that he removed Evans’ vest and pulled her pants down before passing out. Brown also testified that he attempted to have sex with Evans’ body after he and Turner placed it in the woods.
Brown acknowledged having given conflicting accounts of how the murder occurred. He admitted that he lied to the police and that he repeated the lies at his own trial. He testified that he fabricated Turner’s involvement in the murder because he was angry with Turner for telling the police where Evans’ body was located. He stated that at the time, he perceived no difference between telling one lie and telhng several lies. In explaining his recent recantation, Brown stated that his conversion to Christianity was his primary reason for his coming forward. Brown said that as long as he truthfully confessed to what had happened that night, he did not care whether his testimony would help exonerate Turner.
Upon considering the testimony from the evidentiary hearing and the transcripts from the original trials of Turner and Brown, the circuit court found that Brown “is credible in his assertion that he testified falsely at his own trial,” that Brown “testified falsely as to a material fact in the case,” that “Brown’s recantation of his earlier testimony was unknown and unavailable to the petitioner in this proceeding ... at the time of his conviction and at the time his conviction became *409 final,” and that Brown “is credible in his assertion that he acted independently in murdering the victim and that ... Turner played no role in the murder or in the restraining of the victim.”

II. Analysis

A. Standard of Review

Code § 19.2-327.10 confers original jurisdiction upon the Court of Appeals of Virginia to consider a petition for a writ of actual innocence based on newly-discovered, non-biological evidence filed by any individual “convicted of a felony upon a plea of not guilty.” See also Carpitcher v. Commonwealth, 273 Va. 335, 342, 641 S.E.2d 486, 490 (2007). “The writ shall lie to the court that entered the conviction____” Code § 19.2-327.10.
To obtain a writ of actual innocence, a petitioner must allege, inter alia, that the newly-discovered evidence
(1) “was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction became final in the circuit court;” Code § 19.2-327.11(A)(iv),
(2) “is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction by the court;” Code § 19.2-327.11(A)(vi),
(3) “is material and when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt;” Code § 19.2-327.11(A)(vii), and
(4) “is not merely cumulative, corroborative or collateral,” Code § 19.2-327.11(A)(viii).
Carpitcher, 273 Va. at 343-44, 641 S.E.2d at 491. The parties agree that the newly-discovered, non-biological evidence at issue in this case is Brown’s confession that he alone restrained and killed Evans. Brovm provided this confession six years after Turner’s conviction. Thus, of the four elements listed above, only the third is at issue in this case: Whether *410 Turner has carried Ms burden of proving, by clear and convincing evidence,[7] (a) that Brown’s new confession is “material” and (b) that, when considering Brown’s confession with all the other evidence in the current record, “no rational trier of fact could have found proof of guilt beyond a reasonable doubt.”[8] Code § 19.2-327.11(A)(vii).
*411 In analyzing Turner’s petition, we must first determine whether Brown’s statement is “material.” In order to be “material” within the meaning of Code § 19.2-327.11(A)(vii), “evidence supporting a petition for a writ of actual innocence based on non-biological evidence must be true.” Carpitcher, 273 Va. at 345, 641 S.E.2d at 492. If the circuit court cannot determine whether the original testimony, the recantation testimony, or some other version of events is true, the petitioner has not met his burden of proving materiality because “the General Assembly intended to provide relief only to those individuals who can establish that they did not, as a matter of fact, commit the crime for which they were convicted” and not to those “who merely produce evidence contrary to the evidence presented at their criminal trial.” Id. “Because the Court of Appeals cannot hold its own evidentiary hearing to assess a witness’ credibility, but must ultimately determine whether a recantation is true, Code § 19.2-327.12 provides a mechanism to assist the Court of Appeals in this task.” Johnson v. Commonwealth, 273 Va. 315, 322, 641 S.E.2d 480, 484 (2007). Pursuant to that code section,
[i]f the Court of Appeals determines ... that a resolution of the case requires further development of the facts, the court may order the circuit court in which the order of conviction was originally entered to conduct a hearing ... to certify findings of fact with respect to such issues as the Court of Appeals shall direct.
Code § 19.2-327.12 (emphasis added).
To determine the credibility of Brown’s statement, we ordered the circuit court in which the order of conviction was originally entered to conduct a hearing on the credibility of Brown’s recantation testimony and issue certified findings of fact.[9] See Code § 19.2-327.12; see also Johnson, 273 Va. at *412 322-23, 641 S.E.2d at 484 (involving a referral of the recantation of a co-defendant, which the circuit court found was not credible). After conducting an evidentiary hearing, as well as reviewing in detail the evidence that was presented in the prior trials of both Brown and Turner, the circuit court expressly found Brown credible both in his assertion that he testified falsely to a “material” fact at his own trial and in his present statement that “he acted independently in murdering [Evans] and that Turner played no role in the murder or any restraint of the victim.”
Code § 19.2-327.13 then provides, in relevant part:
[u]pon consideration of the petition, the response by the Commonwealth, previous records of the case, the record of *413 any hearing held under this chapter and, if applicable, any findings certified from, the circuit court pursuant to an order issued under this chapter, the Court of Appeals, if it has not already summarily dismissed the petition, shall either dismiss the petition for failure to state a claim or assert grounds upon which relief shall be granted; or the Court shall (i) dismiss the petition for failure to establish previously unknown or unavailable evidence sufficient to justify the issuance of the writ, or (ii) only upon a finding that the petitioner has proven by clear and convincing evidence all of the allegations contained in clauses (iv) through (viii) of subsection A of § 19.2-327.11, and upon a finding that no rational trier of fact could have found proof of guilt beyond a reasonable doubt, grant the writ, and vacate the conviction____
(Emphasis added). The plain language of this code section requires that we give “consideration” to “any findings certified from the circuit court pursuant to an order issued [under Code § 19.2-327.12].” See Marble Techs., Inc. v. City of Hampton, 279 Va. 409, 418, 690 S.E.2d 84, 88 (2010) (“ ‘Legislative intent is determined from the plain meaning of the words used.’ ” (quoting City of Richmond v. Confrere Club of Richmond, 239 Va. 77, 80, 387 S.E.2d 471, 473 (1990))).
Moreover, in explaining how the “factual findings certified by the circuit court in response to the Court of Appeals’ order referring certain factual issues pursuant to Code § 19.2-327.12” should be treated by Virginia’s appellate courts, the Supreme Court of Virginia established the analytic framework to be applied, mandating that “[s]uch factual findings are similar to circuit court findings made under Code § 8.01-654(0 in habeas corpus cases in which [the Supreme Court] ha[s] original jurisdiction and ha[s] referred certain factual issues to the circuit court for an evidentiary hearing.”[10] *414 Carpitcher, 273 Va. at 342-43, 641 S.E.2d at 490 (citations omitted). In habeas corpus cases, “[t]he circuit court’s factual findings ... are entitled to deference and are binding upon [the Supreme] Court unless plainly wrong or without evidence to support them.” Hedrick v. Warden, 264 Va. 486, 496, 570 S.E.2d 840, 847 (2002); see also Yarbrough v. Warden, 269 Va. 184, 195, 609 S.E.2d 30, 36 (2005); Lovitt v. Warden, 266 Va. 216, 229, 585 S.E.2d 801, 808 (2003). The rationale for this framework is that a determination of a witness’ credibility hinges on more than his mere words.
As the trier of fact, the circuit court is charged with the responsibility of considering various factors, including the witness’ demeanor, his opportunity for knowing the things about which he has testified, his bias, and any prior inconsistent statements relating to the subject of his present testimony. In addition, the circumstances of a particular case may raise other factors that the circuit court deems relevant in assessing a witness’ credibility.
Johnson, 273 Va. at 323, 641 S.E.2d at 485 (citations omitted). These observations are available only through live witness testimony. This Court is not authorized to hear testimony and, as a result, we are not equipped to judge the credibility of a witness’ testimony based on his demeanor. Despite our original jurisdiction and the unique nature of the writ, we *415 simply cannot sit as a fact finder in the same sense that a jury or circuit court does. Therefore, like the Supreme Court of Virginia when it sits with original jurisdiction in habeas corpus cases and reviews factual findings made by a circuit court pursuant to Code § 8.01-654(0,[11] we must accept the circuit court’s factual findings made pursuant to Code § 19.2-327.12 unless they are plainly wrong or without evidence to support them. In other words, we may not simply ignore the circuit court’s findings as though they had never been made, as the concurrence advocates.
Here, the order of referral stated as follows: “Upon consideration of the petition, the response of the Attorney General [entitled “Motion to Dismiss”], petitioner’s reply, the records of prior proceedings in this case, and the other exhibits, this Court finds that a resolution of the case requires further development of the facts.” (Emphasis added). Thus, as previously stated, the initial panel that decided to refer Turner’s case to the circuit court for an evidentiary hearing implicitly denied the Commonwealth’s motion to dismiss and made preliminary determinations as to materiality and relevance. On rehearing en banc, we may reject the initial panel’s legal conclusions related to relevance and materiality but not the factual findings made by the circuit court at the panel’s instruction. See Carpitcher, 273 Va. at 342-43, 641 S.E.2d at 490; Johnson, 273 Va. at 323, 641 S.E.2d at 485. Therefore, we are bound to accept the circuit court’s determinations that Brown “is credible in his assertion that he testified falsely at his own trial,” that Brown “testified falsely as to a material fact in the case,” that “Brown’s recantation of his earlier testimony was unknown and unavailable to the petitioner in this proceeding ... at the time of his conviction and at the time his conviction became final,” and that Brown “is credible *416 in his assertion that he acted independently in murdering the victim and that ... Turner played no role in the murder or in the restraining of the victim.”[12]
Moreover, we reject the Commonwealth’s contention that the circuit court’s factual findings were fatally incomplete and conelusory. On referral to the circuit court for factual findings, “[tjhere is no mandatory formula for a circuit court’s consideration of the credibility of a particular witness.” John *417 son, 273 Va. at 323, 641 S.E.2d at 485 (citations omitted). Here, the circuit court clearly answered, albeit briefly, the four questions referred by this Court and thus Mfilled its obligations under Code § 19.2-327.12. Having fully considered the record in this case, we cannot say that the circuit court’s factual findings are plainly wrong or without evidence to support them and, therefore, we are bound by these findings.

B. Turner’s Role in Evans’ Death

Next, we must consider whether Brown’s credible confession, “when considered with all of the other evidence in the current record, ... prove[s] that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.” Code § 19.2-327.11(A)(vii). Turner was convicted of abduction with intent to defile, in violation of Code § 18.2-48, and murder, in violation of Code § 18.2-32, under the felony-murder doctrine. Thus, Brown’s recantation must obviate Turner’s participation in killing Evans and sever the causal connection between Brown’s conduct and the underlying crime that gave rise to Evans’ murder.
Turner argues that we cannot arbitrarily disregard Brown’s recantation and that all other evidence must be viewed in the context of Brown’s assuming sole responsibility for the murder. To that end, Turner asserts that the Commonwealth’s evidence against him is merely circumstantial and does not exclude the reasonable hypothesis of innocence that Brown acted independently in murdering Evans and that Turner had no role in the murder or restraint of Evans. The Commonwealth responds that, based on all of the evidence, a reasonable fact finder could find that Turner abducted Evans with the intent to defile her and, therefore, is not entitled to a writ of actual innocence.
Before this Court may properly grant the writ of actual innocence that Turner seeks, he must demonstrate by clear *418 and convincing evidence that based on all of the evidence in the record, “no rational trier of fact could have found proof of guilt beyond a reasonable doubt.” Code § 19.2-327.11(A)(vii) (emphasis added); accord Carpitcher, 273 Va. at 344, 641 S.E.2d at 491. This analysis is not as simple as merely accepting the circuit court’s determination that Brown testified credibly that he acted alone when he physically committed the murder and that Turner played no role in murdering or restraining Evans.[13] The relevant question is not whether Brown acted alone in killing Evans, but whether Turner abducted her with the intent to defile her.[14] If he did, the fact that Brown may have acted alone in restraining Evans and in murdering her does not absolve Turner of his guilt. In order to be granted a writ of actual innocence, Turner must produce clear and convincing evidence that he did not abduct Evans with the intent to defile her and, therefore, that he is not guilty of felony murder. It is this Court’s statutory duty to examine the entire record, including Brown’s credible confession to Evans’ murder, to determine whether Turner has met his burden. See Code §§ 19.2-327.11 to 19.2-327.14. Having examined the entire record,[15] we conclude that Turner has not *419 met his statutory burden. From the record, a rational fact finder could have found that Turner abducted Evans by deception—meaning no finding of force or restraint would have been required—and that the abduction ended with Evan’s murder. Therefore, we dismiss Turner’s request for a writ of actual innocence and deny his request to vacate his convictions for murder and abduction with intent to defile.
A defendant is guilty of first-degree murder under Code § 18.2-32 where the killing occurs “in the commission of, or attempt to commit, arson, rape, forcible sodomy, inanimate or animate sexual penetration, robbery, burglary or abduction.” This legislation codifies the common law doctrine of felony murder and “elevate[s] to murder a homicide committed during the course of a felony by imputing malice to the killing.” King v. Commonwealth, 6 Va.App. 351, 354, 368 S.E.2d 704, 705 (1988). “[T]he felony murder statute applies where the initial felony and the homicide were parts of one continuous transaction, and were closely related in point of time, place, and causal connection.” Berkeley v. Commonwealth, 19 Va.App. 279, 286, 451 S.E.2d 41, 45 (1994) (holding that a fact finder could reasonably infer that an abduction with intent to rape continued until the victim’s death and, therefore, felony murder occurred). Abduction is a continuing offense and “ ‘it [is] for the fact finder to determine in each case ... whether the [abduction] had been terminated within the purview of [Code § 18.2-32].’ ” Barnes v. Commonwealth, 33 Va.App. 619, 629, 535 S.E.2d 706, 711 (2000) (quoting Haskell v. Commonwealth, 218 Va. 1033, 1043, 243 S.E.2d 477, 483 (1978)). Thus, to determine whether Turner committed felony murder, we must first decide whether the evidence in *420 the record is such that a rational finder of fact could conclude that Turner abducted Evans with the intent to defile her.
A person commits abduction when he “[b]y force, intimidation or deception and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such person of his personal liberty----” Code § 18.2-47.[16] Abduction requires proof of asportation or detention, either of which may be accomplished by force, intimidation, or deception. Jerman v. Dir. of the Dep’t of Corr., 267 Va. 432, 439, 593 S.E.2d 255, 259 (2004) (citing Scott v. Commonwealth, 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984)). The accused need not have used any physical force or restraint against the victim. Kent v. Commonwealth, 165 Va. 840, 841-42, 183 S.E. 177, 177-78 (1936).[17] Virginia case law is clear that, under Code § 18.2-47, an abduction includes a taking away or detention of a person induced by fraud or deception. Jerman, 267 Va. at 439, 593 S.E.2d at 259.
In Jerman, the Supreme Court of Virginia found that an abduction occurred where the evidence proved that one of the petitioner’s confederates convinced the victim to come with her under the ruse of selling illegal narcotics to her and petitioner when their true intent was to harm the victim. Id.; see also Taylor v. Commonwealth, 260 Va. 683, 688, 537 S.E.2d 592, 595 (2000) (holding that the appellant accomplished the abduction through the use of both deception and intimidation). The Supreme Court of Virginia made no men *421 tion of any “restraint” upon the victim in the first abduction in Jerman; rather, the fact that the victim was tricked into getting into the vehicle and traveling with the co-conspirator was enough to prove abduction. 267 Va. at 439, 593 S.E.2d at 259.
Similarly in Kent, the defendant kidnapped the victim with intent to extort money for pecuniary benefit. 165 Va. at 842, 183 S.E. at 178. The evidence showed that the defendant induced the victim to accompany him to Washington, D.C., on the assurance that he would obtain money to satisfy a debt he owed her. Id. at 842, 183 S.E. at 177-78. The defendant argued that he could not be found guilty of kidnapping because the evidence failed to show any force or restraint was used by the accused in taking the victim with him. Id. at 841, 183 S.E. at 177. The Supreme Court of Virginia disagreed with the defendant and held that he was guilty of kidnapping because the evidence showed that the accused took the victim with him under “such circumstances [that] amounted to fraud and coercion on [the defendant’s] part and for the purpose of pecuniary benefit____”[18] Id. at 842, 183 S.E. at 178.
Thus, if based on all of the evidence before this Court, any rational fact finder could have concluded that Turner deceived Evans into leaving the club while at the same time intending to defile her, then a writ of actual innocence should not issue.
The intent to defile element requires proof that the perpetrator intended to engage in sexual contact against the victim’s will. See, e.g., Code §§ 18.2-61 (rape), 18.2-67.1 (forcible sodomy), 18.2-67.3 (aggravated sexual battery), and *422 18.2-67.1 (sexual battery). To prove that Turner abducted Evans with the intent to defile, the Commonwealth was required to prove that he had the specific intent to sexually molest her. Simms v. Commonwealth, 2 Va.App. 614, 617, 346 S.E.2d 734, 735 (1986). “Intent is the purpose formed in a person’s mind which may, and often must, be inferred from the facts and circumstances in a particular case.” Ridley v. Commonwealth, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979). Code §§ 18.2-47 and 18.2-48 do not require that the deception be verbalized and, certainly, it is well settled that one’s intention, such as the intent to deceive, may and often must be proven through the use of circumstantial evidence. See Williams v. Commonwealth, 278 Va. 190, 194, 677 S.E.2d 280, 282 (2009) (reiterating that “[a]bsent a direct admission by the defendant, intent ... must necessarily be proved by circumstantial evidence”).
“There is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence.” Muhammad v. Commonwealth, 269 Va. 451, 479, 619 S.E.2d 16, 31-32 (2005), cert. denied, 547 U.S. 1136 [126 S.Ct. 2035, 164 L.Ed.2d 794] (2006). Our Supreme Court has held that “ ‘circumstantial evidence is competent and is entitled to as much weight as direct evidence[,] provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.’ ” Finney v. Commonwealth, 277 Va. 83, 89, 671 S.E.2d 169, 173 (2009) (quoting Dowden v. Commonwealth, 260 Va. 459, 468, 536 S.E.2d 437, 441 (2000)). Furthermore, circumstantial evidence “is not viewed in isolation.” Muhammad, 269 Va. at 479, 619 S.E.2d at 32. “While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.” Id. (citation omitted).
Brown v. Commonwealth, 54 Va.App. 107, 119, 676 S.E.2d 326, 332 (2009).
Turner’s acts, conduct, and statements may be considered to discern his state of mind. Long v. Common *423 wealth, 8 Va.App. 194, 198, 379 S.E.2d 473, 476 (1989). “The fact finder may consider the conduct of the person involved and all the circumstances revealed by the evidence.” Wynn v. Commonwealth, 5 Va.App. 283, 292, 362 S.E.2d 193, 198 (1987). “When weighing the evidence, the fact finder is not required to accept entirely either party’s account of the facts. The fact finder may reject that which it finds implausible, yet accept other parts which it finds to be believable.” Barnes v. Commonwealth, 33 Va.App. at 630, 535 S.E.2d at 711-12 (2000) (citing Barrett v. Commonwealth, 231 Va. 102, 107, 341 S.E.2d 190, 193 (1986)).
Because it is Turner’s intent that is relevant, Brown’s credible confession to killing Evans cannot be found to be dispositive of what Turner was thinking when he left the club with Evans. Indeed, Brown’s confession only establishes what occurred after he got into the car with Turner and Evans.[19] Thus, Brown’s confession does not change the evidence of Turner’s intent to defile that was before the jury in Turner’s trial. The jury was instructed that abduction with the intent to defile could be accomplished by, inter alia, deception and could have found that Turner deceived Evans into leaving the bar, his nefarious intent unbeknownst to her.[20] Accordingly, it *424 cannot be said that no rational trier of fact could have found Turner guilty beyond a reasonable doubt as the jury did.
Moreover, contrary to the dissent’s contention that “the record is devoid of any evidence that Turner ever engaged or intended to engage in any sexual activity against the will of’ Evans, a review of the entire record before this Court reveals that it is replete with evidence from which a rational finder of fact could reach a conclusion that Turner deceived Evans into leaving the club with him for stated innocent purposes while his true intent was to defile her. Turner testified that he only wanted to talk with Evans and that he had no sexual interest in her. Turner’s actions and, more tellingly, his own words, belie his claim that he did not intend to have sex with Evans. Turner arranged for Bishop to give Brown a ride home if Turner did not return to the club by closing time. During that conversation, Bishop asked Turner if she needed to give Brown a ride home because Turner “was going home with [Evans], and [Turner] said yes.” When Bishop warned Turner that “if that’s what [he’s] going to do, use a condom,” Turner just smirked and laughed in response.[21]
*425 The most telling piece of evidence is Turner’s conversation with Fitzgibbons in which Turner stated that he and Brown were going to have a “threesome” with Evans.[22] Within a few seconds of this, Evans approached and Turner introduced her to Fitzgibbons as she stood next to Brown. Before leaving, Fitzgibbons gave them the thumbs up sign, which Turner returned with a smile on his face.[23]
While Turner denies having made this statement, his petition for a writ of actual innocence supports this sequence of events and the fact that there was an exchange with him, Brown, and Fitzgibbons regarding a “threesome.” In paragraph forty-seven of his petition, Turner states under oath
Petitioner was happy with Bishop’s response and he went to tell Brown about the arrangements. Petitioner remarked that the plan was if he wasn’t back by 2:00 a.m., Bishop should take Brown home. Brown asked Petitioner where he was going with “that chick,” and Petitioner explained. Brown was slurring his words and asked Petitioner what the chances were for him to “get it on with her too.” At that moment, [Fitzgibbons] walked up to them and asked what their plans were for the night. Brown said something to the effect, “I’m going to get a threesome going.”
(Emphasis added).
Turner confirms that he talked with Brown after he arranged for Bishop to take Brown home. Based on Turner’s own version of events, it is clear that Turner planned to have a *426 sexual encounter with Evans as Brown’s response was to inquire about the chances for him to “get[ ] it on with her too.” (Emphasis added). The evidence is also clear that the plan was formulated for both Turner and Brown to have sex with Evans as Fitzgibbons was told that they were going to have a “threesome.” While Turner tries to attribute the “threesome” comment to Brown, Fitzgibbons was clear that it was a declaration made by Turner. Clearly, Brown and Turner made a plan before either left the club to have sex with Evans.
Turner’s intent to have sex with Evans despite that he did not believe Evans would agree is also clear from Evans’ character. Evans’ friend, Burdette, described Evans as a woman who would not speak to anyone using sexual overtures. Burdette also testified that she believed that Evans would not have been speaking to Turner had he made any sexual invitations to Evans. Evans’ other friend, McCammon, similarly believed that Evans had no intent to have a “romantic interlude” that night. As further proof of his intent to defile Evans, Turner confirms these descriptions of Evans. He testified that during the course of the evening, he never discussed sex with her. He also echoed Evans’ friends with regard to her character. Specifically, he stated that in the short time he spent with her, Evans was not the kind of woman who would have engaged in a “threesome.” Yet, he spoke to two different people about having sex with her, although she and he had not discussed it. Moreover, he unreservedly declared that he was going to have a “threesome” with Evans and Brown, even though he did not believe she would have willingly engaged in a “threesome.” From this, a rational trier of fact could conclude that Evans was unaware of Turner’s sexual plans for her and would not have willingly engaged in a “threesome,” despite that being his intention.
The record also contains evidence of Turner’s aggressive nature, especially when things were not going his way. Burdette testified that Turner was “exceptionally rude” to her and McCammon and that he spoke to them in a “horribly belligerent tone[.]” Burdette told the jury that Turner “pulled the *427 [car] door open with surprising force” when he and Evans finally prevailed in devising the plan for Evans to stay with Turner for one additional hour.
Moreover, statements and conduct of an accused after the events that constitute the charged crime also are relevant circumstantial evidence of intent. See Canipe v. Commonwealth, 25 Va.App. 629, 645, 491 S.E.2d 747, 754 (1997). Here, Turner’s callous disregard for Evans, displayed after her murder, is consistent with a finding that he intended to defile her before she was murdered. The evidence demonstrates that within minutes of Brown Wiling Evans, Turner alone took the lead in finding an isolated spot to dispose of her body, as both men testified that Brown passed out seconds after he killed Evans. Rather than maWng known what occurred, Turner drove from Virginia Beach to a secluded area in a Newport News city park where it was unlikely that Evans’ body would be found. After finding the appropriate spot, he then woke Brown up to assist him in moving and covering Evans’ body. The day after Turner witnessed Brown end a young woman’s life without any provocation, Turner still desired to rent an apartment with Brown. Additionally, a few days after the police and FBI agents interviewed Turner and Brown at the naval base, Turner and Brown had occasion to peruse the current, local newspaper covering Evans’ death. One of the newspapers contained a composite sketch purportedly of Turner. Throughout the meal, Turner and Brown repeatedly laughed and joked that the sketch looked nothing like Turner.
Turner’s aptitude for being convincing even when being deceptive is also demonstrated by the record. An FBI agent interviewing Turner found him to be “very calm, very collected” and his answers seemed very forthright while Turner repeatedly lied to police and FBI officials about leaving the club separately from Evans. Another police officer present for the interview said that Turner “seemed calm, cool. Had his thoughts about him and talked very straightforward.”
*428 Thus, the record provides ample evidence of Turner’s art of deception, determination to spend time with Evans, aggressive demeanor toward her friends, and unremorseful reaction after witnessing Brown end Evans’ life. There is also significant, contradictory evidence of Turner’s claim that he had no interest in having sexual relations with Evans and his attempts to facilitate such relations. The evidence further proves that Turner walked Evans to his car on the pretext of waiting for her friends. He did not disclose to her his stated intention to Fitzgibbons to have a “threesome” -with her and Brown. Certainly, the act of engaging in a “threesome” does not, in and of itself, provide evidence of Turner’s intent to defile Evans. However, the evidence in the record when considered as a whole—including Turner’s belief that Evans would not be receptive to sexual advances, Turner’s claims that he had no interest in having sexual relations with Evans, and his declaration to Fitzgibbons that he intended to have a “threesome” with Evans—enables a rational trier of fact to infer that Turner intended to have sexual relations with Evans against her will.
As discussed above, the record in toto provides more than sufficient evidence from which a rational trier of fact could conclude that Turner deceived Evans into going to his car with the true intent of both he and Brown having a “threesome” with Evans against her will. Moreover, the fact finder could also reasonably find that this was a shared intent as Brown was present when Turner told Fitzgibbons that he and Brown intended to have a “threesome” with Evans. The evidence also demonstrates that when Turner saw Brown approaching, he cautioned Evans not to believe a word Brown said. The evidence further shows that when Brown joined Evans and Turner in Turner’s car, Brown asked Evans whether she was a virgin and whether she had ever had sex with a “frogman” immediately before “snapping” and killing her. From all of this evidence, a rational trier of fact could conclude that Brown and Turner intended to forcibly have sexual relations with Evans and that Brown killed Evans when she rebuffed his advances. The trier of fact could have found that because *429 of this shared sexual desire, the abduction had not ended prior to Evans’ murder.

III. Conclusion

Based on all of the evidence in the record, it cannot be said that Brown’s credible recantation provides this Court with clear and convincing evidence that no rational fact finder could have found that Turner used deception to abduct Evans with the intent to have sexual intercourse with her against her will. Therefore, Turner was properly convicted of abduction with intent to defile and murder. Accordingly, we dismiss his petition for a writ of actual innocence and vacate the August 4, 2009 order issued by a panel of this Court.

. Brown was also convicted of the attempted rape of Evans.

. Fitzgibbons admitted that he was drinking that night, but could not remember how much he consumed other than less than twelve beers.

. Several other witnesses also testified that Turner and Brown had a reputation for having group sexual encounters.

. The concurring opinion states that
[p]rior to its decision to grant the writ of actual innocence, the three-judge panel of this Court made two preliminary decisions that were critical to the ultimate outcome. The first was to defer ruling on the Commonwealth’s motion to dismiss. The second was to remand the case to the circuit court for a factual finding regarding the credibility of the testimony of Billy Brown.
This opinion repeatedly refers to “the panel." As set forth by statute, "[ejach panel [of this Court] shall hear and determine, independently of the others, ... the other cases assigned to that panel.” Code § 17.1-402(C) (emphasis added). Thus, it must be noted that the divided panel that granted Turner’s petition for a writ of actual innocence was a separate panel from the one that referred the matter to the circuit court for factual findings. The concurring opinion relies upon the position that the first panel did not rule on the Commonwealth’s motion to dismiss. Contrary to this position, the referring panel did not defer ruling on the Commonwealth's motion to dismiss. "Motion to Dismiss” is the style that the Commonwealth gave its response to Turner’s petition for a writ of actual innocence. Indeed, the relief sought by the Commonwealth was that this Court "should not order an evidentiary hearing but should dismiss the petition.” Thus, by referring the matter to the circuit court for an evidentiary hearing and ultimately sending the matter on to be heard on its merits, the referring panel implicitly denied the Commonwealth's motion to dismiss.

. This Court posed this fourth question to the circuit court upon a motion by Turner.

. It appears that there are two versions of an affidavit signed by Brown. In one version, which was notarized and presented in support of Turner’s petition, Brown stated that Evans died instantly, and in the other, Brown stated that she revived and he choked her a second time killing her. At oral argument, the Commonwealth asserted that the existence of the two differing versions was critically important to the circuit court’s determination of Brown's credibility. Specifically, the Commonwealth argued that it was entirely possible that the circuit court would have found Brown not to be credible if it had known of the two versions. Even though both versions of the affidavit were not physically before the circuit court, the fact that a discrepancy existed between them was before the circuit court. The Commonwealth questioned Brown at the evidentiary hearing about the version of the affidavit in which Brown said that he had to strangle Evans twice to kill her and his earlier testimony at the hearing that Evans died instantly. More specifically, during cross-examination, the following was said:
[Commonwealth:] Let me read you a few sentences of this affidavit you signed----He did not encourage me in any way and, in fact, I remember one instance while I was choking Jennifer!,] Dustin tried to pull my hands away. Jennifer became unconscious and I believed she was dead. I fell back in the seat, and she woke up. I then choked her again until blood came out of her nose and am certain *408 she was dead at that time. We were still in the parking lot. I do not know why I did it.
That statement reflects, does it not, that she was not killed instantly or rendered helpless instantly but, in fact, revived and you had to choke her a second time, correct?
[Brown:] Yes.
Brown then responded affirmatively when asked by the Commonwealth: “[W]as there a period where [Evans] was seemingly unconscious or worse and then revived and then you had to assault her a second time?"
Despite these contradictions, the circuit court found that Brown’s testimony in that proceeding was credible, and we are bound by that determination.

. The concurrence avers that "the new evidence must conclusively show that the petitioner’s guilt is a factual impossibility." (Emphases added). It attempts to draw a distinction based on the level of certainty of guilt provided by DNA evidence as compared to what it views as the lesser degree of certainty provided by testimonial evidence. The concurring opinion views after-discovered testimonial evidence as "uncertain" because "when a witness testifies to a fact," he “could be telling the truth as he understands it, but he could be mistaken due to poor eyesight or poor memory," or he "[could] appear entirely credible[ ] but actually be lying." It posits, as a result, that "testimony can be credible—that is, believable—without being factually dispositive of the issue of innocence.” Although this statement is certainly true in the abstract, the concurrence implies that the circuit court's finding on referral that Brown’s testimony is credible does not mean we must accept Brown’s testimony over other evidence, presented at trial, with which it conflicts.
What the concurrence fails to acknowledge is that both our legal system in general and the actual innocence statutes in particular equate credibility with truth. If the fact finder—in this case the circuit court to which the matter was referred for additional findings—concludes the testimony given on referral is credible, we treat that testimony as "the truth.” See Johnson v. Commonwealth, 273 Va. 315, 323-24, 641 S.E.2d 480, 484-85 (2007) (using the terms "truth” and "credibility” interchangeably in analyzing the impact of the circuit court’s findings on referral); see also, e.g., Molina v. Commonwealth, 272 Va. 666, 671, 636 S.E.2d 470, 473 (2006) (holding that on direct appellate review, "we must ‘regard as true all the credible evidence favorable to [the parly who prevailed below]’ ” (quoting Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphases added))). Further, no practical distinction exists in our jurisprudence between "truth" based on testimonial evidence and "truth” based on scientific evidence such as DNA. Just as the accuracy of eyewitness testimony depends on factors such as perception, memory, and credibility, DNA evidence depends upon the qualification and credibility of the analyst and the quality control and other procedures of the laboratory.

. This confession is a recantation because it unequivocally repudiates the version of events implicating Turner that Brown gave to investigators in 1995 and under oath at his own trial in 1996. See Black’s Law Dictionary 1295 (8th ed.2004) (defining the term "recant” as "[t]o withdraw or renounce prior statements or testimony formally or publicly”) (emphasis added). It is immaterial that Brown did not testify at *411 Turner’s trial, especially in light of the sworn testimony Brown had previously given at his own trial, which clearly demonstrated his intent to incriminate Turner if he were called. Brown's recantation testimony was unavailable at the time of Turner’s original trial, and the Commonwealth does not contend otherwise.

. The concurrence asserts that it was unnecessary to remand this matter to the circuit court for an evidentiary hearing. As previously *412 mentioned, two separate panels addressed different issues in this case. It is the decision by the second panel, the merit panel, that is before this Court sitting en banc. As set forth by the General Assembly, this Court
shall sit en banc (i) when there is a dissent in the panel to which the case was originally assigned and an aggrieved party requests an en banc hearing and at least four judges of the court vote in favor of such a hearing or (ii) when any judge of any panel shall certify that in his opinion a decision of such panel of the court is in conflict with a prior decision of the court or of any panel thereof and three other judges of the court concur in that view. The court may sit en banc upon its own motion at any time, in any case in which a majority of the court determines it appropriate to do so.
Code § 17.1—402(D). Contrary to the view expressed by the concurrence, the issue of whether the referring panel needlessly sent the matter back to the circuit court for factual findings is not an issue on which either party sought review, nor is it an issue granted by this Court for consideration en banc. The panel's decision to remand the case for factual findings was unanimous, and no judge has certified that the panel decision was in conflict with a prior decision of this Court. Moreover, this Court has made no motion, joined by a majority of the Court, to sit en banc to reconsider the referring panel’s decision to remand the matter to the circuit court. Therefore, the referring panel’s decision is not before this Court sitting en banc. To determine at this juncture that the decision to remand was improper, without complying with Code § 17.1-402(D), or allowing the parties to brief the issue, would be inappropriate. This case is in a different procedural posture from that of Startin v. Commonwealth, 56 Va.App. 26, 690 S.E.2d 310 (2010) (en banc), in which this Court most recently overruled a prior panel decision. In Startin, this Court was specifically asked on brief to consider the continuing viability of Sprouse v. Commonwealth, 19 Va.App. 548, 453 S.E.2d 303 (1995).

. Because the concurrence asserts that it was unnecessary to remand this matter to the circuit court, it further contends that the credibility determinations made by that circuit court are irrelevant. Specifically, in footnote 36, the concurring opinion states that in Carpitcher, 273 Va. *414 at 342-43, 641 S.E.2d at 490, the Supreme Court of Virginia recited "the standard of review that it would apply in its appellate function of reviewing this Court’s dismissal of an actual innocence petition” and held that the circuit court’s "factual findings pursuant to Code § 19.2-327.12 are only binding if they are approved by the Court of Appeals.” This interpretation of Carpitcher considers only part of the pronouncement by the Supreme Court of Virginia and ignores the analytical framework clearly outlined by the Supreme Court.
Contrary to the concurring opinion’s position that the Supreme Court of Virginia was referring only to the standard of analysis that it would apply to factual findings as approved by this Court, clearly the Supreme Court was also indicating that because factual findings referred to and made by the circuit court under the Writ of Actual Innocence code sections are similar to those in habeas corpus cases, the same standard of deference, i.e., that findings are binding unless plainly wrong or without evidence to support them, applies to our treatment of the circuit court’s findings.

. Code § 8.01-654(C)(1) confers exclusive jurisdiction upon the Supreme Court of Virginia to consider and award writs of habeas corpus in cases where the petitioner is held under a sentence of death. In such cases, the Supreme Court of Virginia may order the circuit court to conduct an evidentiary hearing to make necessary factual findings as instructed by the Supreme Court.

. Although the en banc Court may revisit the legal significance of the circuit court’s findings on referral, the concurrence's position that the statute requires us to view Brown’s recantation testimony as "just another piece of evidence that the jury would have considered” strips the statute of its primary purpose in allowing for referral to the circuit court and flies in the face of the holdings in Carpitcher and Johnson. A fundamental issue in dispute at this stage of our review of Turner’s petition is our treatment of the circuit court's findings. This Court is bound by the plain language of Code § 19.2-327.13, which dictates that we are to give “consideration” to “any findings certified from the circuit court pursuant to an order issued [under Code § 19.2-327.12].” See Marble Techs., Inc., 279 Va. at 418, 690 S.E.2d at 88. We, therefore, must consider, at this stage of the proceedings, the circuit court’s findings regarding the credibility of Brown's confession, along "with all of the other evidence in the current record,” to reach our ultimate decision of whether Turner has ”prove[d] that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.” Code § 19.2-327.11. In other words, we may not simply ignore the circuit court's findings as though they had never been made, as the concurrence advocates. Upon our referral, the circuit court acted as the fact finder to determine whether Brown’s most recent statement was his definitive testimony regarding what happened rather than just "one more in a series of conflicting and unreliable tales.” The concurring opinion, in noting it is “quite reasonable to conclude that a hypothetical juror would have chosen to ignore Brown’s testimony in its entirely and decide the case on the same evidence considered by the original jury,” mistakenly ignores the fact that the circuit court, with regard to the questions referenced from this Court, became the fact finder, i.e., the hypothetical juror of which the concurrence speaks—a substitute for the original trial jury—and concluded that Brown’s recantation testimony should be credited in the context of the questions posed to it.
Here, because the circuit court found Brown’s recantation testimony that he alone restrained and killed Evans to be credible in the context of the entire record, we must evaluate the record by rejecting all evidence that is in conflict with the circuit court’s findings before assessing whether “no rational trier of fact could have found proof of guilt *417 beyond a reasonable doubt” upon the evidence that remains. Code § 19.2-327. ll(A)(vii).

. The dissent states that "[i]f X says that he did it and that Y did not participate in any way, and the jury believes X, there is no legal way to convict Y.” This analysis grossly oversimplifies the question of Turner’s guilt because the fact finder in Turner’s original trial was instructed as to felony murder, contrary to the dissent’s assertion that this is a novel theory, and Brown’s most recent recitation of events that has been accepted as credible states only that Turner did not participate in restraining or murdering Evans. Brown’s confession is silent, as it necessarily must be, as to Turner's intent at the time that he left the club with Evans. Thus, based on the theory of this case presented to the fact finder—i.e., felony murder predicated on Turner’s abduction of Evans with the intent to defile her—it cannot be said that there is "no legal way to convict” Turner.

. The dissent's determination that "[t]he circuit court, by referring to the murder and the restraint in the disjunctive, contemplated Brown’s recantation in light of both the actual killing and the underlying crime of abduction" is unsupported and requires an inferential leap.

. We have received correspondence from the Commonwealth alleging that it has discovered evidence that would call into question the credibility of Brown’s recantation and tend to support a finding of *419 Turner’s guilt. The Commonwealth has neither made a formal motion nor asked anything of this Court in light of this alleged evidence. Assuming, without deciding, that this information is credible, it would only strengthen our position. Therefore, even if the Commonwealth properly asked this Court to consider the alleged new evidence, it would at best be cumulative and not change the disposition of Turner's petition for a writ of actual innocence.

. The penalty is enhanced “for the abduction of any person with the intent to defile such person.”

. The dissent refers to Kent and Jerman as cases where the appellants told "specific lies” to accomplish the abductions. However, Code §§ 18.2-47 and 18.2—48 do not require that the deception be verbalized and, certainly, it is well settled that one's intention, such as the intent to deceive, may and often must be proven through the use of circumstantial evidence. Williams v. Commonwealth, 278 Va. 190, 194, 677 S.E.2d 280, 282 (2009) (reiterating that "[a]bsent a direct admission by the defendant, intent ... must necessarily be proved by circumstantial evidence”).

. When Kent was convicted the then in effect statute stated, "[i]f any person seize, take or secrete any other person with intent to extort money, or pecuniary benefit, he shall be punished with death, or within the discretion of the jury be confined in the penitentiary not less than eight nor more than twenty years.” The holding in Kent points out the error in the dissent’s position that every abduction necessarily includes restraint. Indeed, that was the very defense advanced by Kent—that he could not be found guilly of kidnapping because the evidence failed to show force or restraint. The Supreme Court of Virginia disagreed, holding that the evidence was sufficient because he took the victim by fraud or coercion.

. In his confession, Brown reiterates his prior statements that he did not intend to have sex that night. His recent confession, however, has no bearing on what a reasonable fact finder could conclude about Turner’s and Brown’s sexual intent prior to Brown joining Evans and Turner in Turner’s car because Brown’s confession and the credibility finding made by the circuit court focused on the details of how he killed Evans and what followed after he met them in the car. Indeed, Brown’s protestations that he was not sexually interested in Evans are belied by his interview with Turner’s attorney and by his own testimony at the evidentiary hearing where he recounted his sexual overtures toward Evans immediately upon getting into Turner’s car and admitted to trying to have intercourse with Evans’ corpse twice.

. Though the record, unfortunately, is devoid of the closing arguments made to the jury in Turner’s trial, it is clear from the trial court’s ruling on Turner’s motion to strike and from the jury instructions specifically stating that Turner could have used "force, intimidation or deception [to] seize, take, transport, detain or secrete ... Evans” that the abduction by deception theory was advanced in the trial court. In ruling on Turner’s motion to strike, the trial court held that there was sufficient *424 evidence from which a fact finder could conclude that Evans did not "knowingly and willingly [go] with ... Turner to the parking lot or to his car for the purposes of engaging in a threesome or what has been discussed as group sex with [Turner] and ... Brown; but we certainly know from the evidence in this case that that was the defendant’s intent----It’s clear from all the circumstances in evidence in this case that the defendant had a sexual mode; and, of course, his specific intent to defile or sexually molest ... can be derived not only from his conduct but from his statements as well." (Emphasis added).

. Bishop testified as such in Brown’s trial. Code § 19.2-327.11(C) permits the Commonwealth’s response to a petition for a writ of actual innocence to "contain a proffer of any evidence pertaining to the guilt of the petitioner that is not included in the record of the case, including evidence that was suppressed at trial.” Moreover, ”[t]he Court of Appeals may inspect the record of any trial or appellate court action, and the Court may, in any case, award a writ of certiorari to the clerk of the respective court below, and have brought before the Court the whole record or any part of any record." Code § 19.2-327.11(D). Here, the Commonwealth requested and the circuit court ordered, without objection from Turner’s counsel, that the entire record in Brown’s trial be made a part of the record in Turner’s petition for a *425 writ of actual innocence. Thus, all of the testimony given in Brown's trial may be considered by this Court when determining whether a writ of actual innocence should issue.

. Fitzgibbons testified that he understood "threesome” to mean a sexual encounter involving Turner, Brown, and a woman, in this instance, Evans.

. According to the evidence in the record, Turner arranged a ride for Brown around 1:15 a.m. Sometime later, around 1:30 a.m., Turner and Brown are together and make the threesome comment to Fitzgibbons. Fifteen minutes would have been more than enough time for their plan to have changed.