Present: Lacy, Keenan, Koontz, Kinser, Lemons, and Agee,
JJ., and Compton, S.J.

TIMOTHY JERMAN

v.  Record No. 030461  OPINION BY JUSTICE CYNTHIA D. KINSER
                                    March 5, 2004
DIRECTOR OF THE DEPARTMENT
OF CORRECTIONS

            UPON A PETITION FOR WRIT OF HABEAS CORPUS


     In this petition for writ of habeas corpus filed under

the Court's original jurisdiction, we address claims of

ineffective assistance of counsel with regard to the

petitioner's conviction for abduction.  Concluding that

there is not a reasonable probability that, but for

counsel's alleged deficiencies, the outcome of the

proceeding would have been different, we will dismiss the

petition.

        PRIOR PROCEEDINGS AND PRESENT HABEAS CLAIMS

     Timothy Jerman, the petitioner, was indicted in the

Circuit Court of Fairfax County for first-degree murder and

abduction.  A jury convicted him of second-degree murder

and abduction.  The Court of Appeals of Virginia reversed

Jerman's abduction conviction.  Jerman v. Commonwealth, 34

Va. App. 323, 328, 541 S.E.2d 307, 309 (2001).  However,

this Court subsequently reversed the judgment of the Court

of Appeals and reinstated the abduction conviction.

Commonwealth v. Jerman, 263 Va. 88, 94, 556 S.E.2d 754, 758 (2002).

Jerman then filed a petition for writ of habeas corpus pursuant to this Court's original jurisdiction. See Code § 17.1-310; Rule 5:7. By order dated October 8, 2003, this Court placed on its privileged docket the following claims raised in the petition:

> Claim (2)(C), in which petitioner alleges that he was denied effective assistance of counsel when counsel failed to raise at trial or on direct appeal (1) that the evidence was constitutionally insufficient to convict petitioner of abduction; and (2) that petitioner "was denied his rights to due process, to a fair trial, and to be free from double jeopardy when the conviction for abduction was based on the restraint inherent from the underlying assault."

> Claim (2)(D), in which petitioner alleges that he was denied effective assistance of counsel when "counsel failed to present a jury instruction that the restraint inherent in the assault/murder cannot serve as the sole basis for a separate abduction conviction."[1]

RELEVANT FACTS

At trial, the evidence established that Jerman made plans with several of his friends, Micah A. Bohn ("Bohn"), with whom Jerman was living, Joe Kern ("Joe") and his brother Frank Kern ("Frank"), and Lisa A. Panko ("Panko"),

_____

[1] In the same order, the Court held that the writ should not issue as to the other claims raised in Jerman's habeas corpus petition.

2

to have a party to celebrate the high school graduation of Cassie Bohn, Jerman's girlfriend. The party was to take place at Jerman's home. Some of the group decided to purchase 100 Ecstasy pills for the party.[2]

Panko made arrangements to purchase the pills from the victim, Justin Rhatigan ("Rhatigan"). Bohn, Panko, and Frank met Rhatigan at an ice cream store where Bohn and Rhatigan completed the drug transaction. According to Panko, Rhatigan then "bolted" out of the store. Before leaving the store, Panko and the others discovered that Rhatigan had sold them aspirin instead of Ecstasy. They tried to page Rhatigan, but he did not respond.

After several weeks of trying to contact Rhatigan, Panko was finally able to do so through a friend. Panko asked Rhatigan why he had not sold them Ecstasy, and he responded that he needed money to repay some people. In the same conversation, Rhatigan supposedly threatened to kill Bohn. Panko and Rhatigan then made plans to "hangout" sometime during the upcoming weekend. Panko told Bohn about her conversation with Rhatigan, and Bohn asked her where they could all meet so he could get back the money that he had paid Rhatigan for the imitation pills.

---

[2] "Ecstasy" is metholanedioxine, an amphetamine. See Wolfe v. Commonwealth, 265 Va. 193, 203, 576 S.E.2d 471,

3

Panko and Rhatigan subsequently decided to get together on Saturday evening, July 10, 1999. Panko informed Rhatigan that one of her friends was coming to her house that same night, but Rhatigan did not object. Panko also told Bohn that Rhatigan would probably be at her house on that particular Saturday evening and that they could confront him there about the money.

Sometime between 9:30 p.m. and 10:00 p.m. on that Saturday, Jerman, Bohn, and Joe drove to Panko's house in Bohn's van. From the time they arrived until around midnight, Panko paged Rhatigan several times, but he did not respond to the pages. During this same period of time, Jerman, Bohn, and Joe decided that, when Rhatigan arrived, they would position themselves on each of the three floors of the house, with Joe in the basement, Bohn in the kitchen on the second floor, and Jerman upstairs on the third floor. Their strategy was to keep Rhatigan from getting away if he tried to run. Panko testified that, at some point during this same period of time, Joe brought a baseball bat into the house and told the others there to hit Rhatigan only in the legs, not in the head.

Finally, between 12:30 a.m. and 1:00 a.m., Rhatigan called Panko in response to her prior pages. She told him

477, cert. denied, ____ U.S. ____, 124 S.Ct. 566 (2003).

4

that several of her friends were at her house and they "all wanted to trip."  Panko arranged to pick Rhatigan up and drive him back to her house.  She did not tell Rhatigan her true reason for bringing him there, so her friends could confront him about the money.

When Panko returned home with Rhatigan and both walked upstairs to the living room, Jerman, Bohn, and Joe emerged from their respective positions in the house.  Panko testified that the three men grabbed Rhatigan near the front door, and then "they went all the way downstairs."  Panko heard Bohn ask Rhatigan, "Remember me?"  And, she then heard Rhatigan saying, "Oh, stop, stop."  Panko remained in the kitchen.

A minute or two later, Jerman came upstairs and asked Panko how to open the gate located in the backyard fence.  She told him that the gate was "boarded shut" and that there was no way to get to the other side of the fence.  A 13-year-old neighbor, Joseph R. Worsham ("Worsham"), observed two people emerge from Panko's house, carry a body-like object through the yard to the fence, and then run back into the house without the object.  Worsham also saw a third person fixing the curtains inside the house and someone running back out to the fence.  Soon thereafter, everyone left Panko's house.

5

Testifying on his own behalf, Jerman admitted that he knew that Bohn and Panko "had been ripped off" by Rhatigan. On the Saturday evening in question, Jerman heard Panko and Bohn discussing the fact that Rhatigan might be coming to her house and that, if he did, Bohn could get his money back from Rhatigan. Jerman thought there might be an altercation if Bohn confronted Rhatigan about the money. According to Jerman, Joe brought three baseball bats into the house after Panko left to pick up Rhatigan because they thought some of Rhatigan's friends might come back with him. Joe carried one of the baseball bats up to the third level of the house where Jerman was sitting. While Jerman denied ever picking up that baseball bat, he acknowledged hearing Joe's statement to hit Rhatigan in the legs, not in the head.

Jerman testified that, after Panko and Rhatigan arrived at the house, Jerman first heard the verbal exchange between Bohn and Rhatigan and then heard "a bunch of racket[; n]o words, just a bunch of commotion." Jerman claimed that he then ran from the top level of the house to the middle level where Panko was standing and on down to the basement. There, he saw Bohn and Joe each holding a baseball bat and Rhatigan lying on a couch.

6

Continuing, Jerman admitted that Bohn and Joe picked up Rhatigan's body, carried it through the backyard, and tossed it over the fence. He also admitted that he was the other person that Worsham had seen running out to the fence. Jerman claimed that he tried to open the fence gate so he could determine if Rhatigan was "okay" before everyone left Panko's house. Jerman acknowledged that, when he departed, he knew an unconscious man had been left lying on the ground behind the fence.

Rhatigan's body was discovered in the early morning hours on Sunday. Rhatigan was taken to a hospital where he eventually died. The cause of death was blunt force trauma to his head.

ANALYSIS

In this collateral attack on the abduction conviction, Jerman has the burden of proving by a preponderance of the evidence his claims of ineffective assistance of counsel. See Green v. Young, 264 Va. 604, 608, 571 S.E.2d 135, 138 (2002); Nolan v. Peyton, 208 Va. 109, 112, 155 S.E.2d 318, 321 (1967). To prevail on the claims, Jerman must satisfy both parts of a two-part test established in Strickland v. Washington, 466 U.S. 668, 687 (1984). Jerman must first prove that his counsel's "performance was deficient," meaning that "counsel made errors so serious that counsel

7

was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Jerman must next show that "the deficient performance prejudiced the defense," that is to say "counsel's errors were so serious as to deprive the defendant of a fair trial." Id. Unless Jerman establishes both prongs of the two-part test, his claims of ineffective assistance of counsel will fail. Id.

To resolve Jerman's claims, we will proceed directly to the prejudice prong of the Strickland two-part test. We do so because it is not necessary to determine whether counsel's performance was deficient before deciding whether Jerman suffered any prejudice because of the alleged deficiencies. See id. at 697. The test for determining prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

All Jerman's claims of ineffective assistance of counsel turn on his assertion that the abduction conviction was based solely on the restraint inherent in the physical attack on Rhatigan that led to his death, and that there was no evidence of any restraint separate and apart from that necessary to carry out the assault. Thus, he claims that trial counsel was ineffective for failing to renew a motion to strike on that basis at the close of all the

8

evidence and for failing to offer a jury instruction stating that the restraint inherent in the assault/murder of Rhatigan could not serve as the sole basis for a conviction for abduction.[3] He also claims that appellate counsel was ineffective for failing to raise sufficiency of evidence and double jeopardy questions on direct appeal of his abduction conviction.

Jerman was convicted of abduction in violation of Code § 18.2-47. That statute, in relevant part, states that "[a]ny person, who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such other person of his personal liberty . . . shall be deemed guilty of 'abduction[.]' " In Scott v. Commonwealth, 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984), we held that Code § 18.2-47 changed the common-law rule requiring proof of asportation in order to sustain

---

[3] Trial counsel moved to strike at the close of the Commonwealth's evidence. Counsel argued, among other things, that there was no evidence of any restraint separate and apart from that inherent in the assault. After presenting evidence on behalf of the defense, trial counsel did not renew the motion to strike. In an affidavit filed as an exhibit to the respondent's memorandum of law in support of his motion to dismiss the habeas petition, trial counsel stated that he did not renew the motion to strike at the conclusion of the evidence because he "believ[ed] it to be a futile gesture in lieu

a conviction for abduction.  Now, under the statute, mere detention is sufficient, id., and the asportation or detention can be accomplished by either force, intimidation, or deception.  Code § 18.2-47.  However, when one is accused of abduction by detention and another crime involving restraint of the victim, both arising out of a continuing course of conduct, convictions for separate offenses with separate penalties are permitted "only when the detention committed in the act of abduction is separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime."  Brown v. Commonwealth, 230 Va. 310, 314, 337 S.E.2d 711, 714 (1985).

Focusing on our decision in Brown, Jerman argues that "the charges of abduction and murder grew out of a continuing course of conduct, and the detention committed in the act of abduction was merely incidental to, not separate and apart from, the restraint employed in the commission of the assault."  Jerman's argument ignores the evidence establishing two acts of abduction that clearly were not inherent in, but were distinct from, the physical attack upon Rhatigan.

---

[sic] of the evidence that had been introduced during the course of the trial."

10

The first abduction was accomplished through asportation by deception, which is proscribed by Code § 18.2-47. Panko picked Rhatigan up and drove him to her house on the pretext that some of her friends were there and they "all wanted to trip." She did not disclose to Rhatigan the fact that Jerman, Bohn, and Joe were awaiting him with baseball bats. Jerman, along with the others, knew about and participated in the scheme to lure Rhatigan to Panko's house for the purpose of confronting him about the money paid for the imitation pills.

The second abduction occurred when Bohn and Joe carried Rhatigan's body out of the house, through the backyard to the fence, and then tossed him over the fence. This occurred when Jerman, even by his own testimony, was in the basement; he admitted seeing Bohn and Joe pick Rhatigan's body up off the couch. Jerman also admitted that he was the person who ran back out to the fence and who asked Panko how to open the gate.

In both acts of abduction, Jerman acted, at a minimum, as a principal in the second degree.[4] See Jones v. Commonwealth, 208 Va. 370, 372, 157 S.E.2d 907, 909 (1967) ("A principal in the second degree, or an aider or abettor

---

[4] The jury was instructed with regard to the law concerning a principal in the second degree.

11

as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime.")  Thus, we conclude that the evidence was sufficient to convict Jerman of abduction. Consequently, under the Strickland prejudice prong, there is not a reasonable probability that there would have been a different outcome if Jerman's trial counsel had moved, at the close of all the evidence, to strike the evidence on the abduction charge.  Such a motion would have been without merit.

We further conclude that there is not a reasonable probability that the jury would have acquitted Jerman of the abduction charge if trial counsel had requested a jury instruction stating that the restraint inherent in the assault of Rhatigan could not serve as the sole basis for a separate abduction conviction.  The jury in this case was instructed that the crime of abduction requires, among other things, "[t]hat the defendant by force, intimidation or deception did seize, take, transport, detain or hide Justin Rhatigan."  Under that instruction, the evidence in this case proved abduction by deception before the assault and abduction by force after the assault.  Neither involved the restraint or force inherent in the act of murdering Rhatigan.  It is that restraint which is the subject of the

12

instruction now proposed by Jerman. Thus, Jerman's defense was not prejudiced by trial counsel's failure to offer the instruction. See Strickland, 466 U.S. at 687.

Finally, with regard to his claim of ineffective assistance of appellate counsel, we again find no prejudice under the Strickland test. Based on the evidence of abduction already discussed, there is not a reasonable probability that a different result would have been obtained on appeal if appellate counsel had challenged the sufficiency of that evidence or raised a double jeopardy claim. Moreover, appellate counsel's performance was not deficient under the Strickland test. Appellate counsel could not have successfully challenged Jerman's abduction conviction for lack of evidence because that argument was procedurally defaulted when trial counsel failed to renew the motion to strike at the close of all the evidence. See Spangler v. Commonwealth, 188 Va. 436, 438, 50 S.E.2d 265, 266 (1948); Rule 5:25. Counsel does not render ineffective assistance when making a strategic decision to appeal certain errors and not to appeal weaker claims. See Jones v. Barnes, 463 U.S. 745, 751 (1983); see also Strickland, 466 U.S. at 689.

CONCLUSION

13

For these reasons, we conclude that Jerman's claims of ineffective assistance of counsel are without merit. Thus, we will dismiss the petition for writ of habeas corpus.

Dismissed.