COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Judges Causey, Friedman and Senior Judge Clements
Argued at Richmond, Virginia


DESTINEE SHANAE NEWMAN
                                                    MEMORANDUM OPINION* BY
v.        Record No. 1532-23-2               JUDGE DORIS HENDERSON CAUSEY
                                                         MAY 6, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

Mitchell D. Jacobs (Eugene H. Frost, PLLC, on briefs), for
appellant.

Robert D. Bauer, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury sitting in Spotsylvania County convicted Destinee Shanae Newman of abduction for

pecuniary benefit, conspiracy to commit abduction, aggravated malicious wounding, conspiracy to

commit malicious wounding, robbery resulting in serious bodily injury, conspiracy to commit

robbery, and three counts of use of a firearm in the commission of a felony.  On appeal, Newman

contends that the trial court should have granted her motion to strike the evidence of abduction and

use of a firearm in the commission of abduction because the alleged abduction was merely

incidental to the robbery and aggravated malicious wounding offenses.  She further asserts that the

Commonwealth failed to prove that she participated in the substantive offenses as a principal in the

second degree.  For the following reasons, we disagree with Newman and affirm her convictions.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth."

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v.*

*Hudson*, 265 Va. 505, 514 (2003)). "That principle requires us to 'discard the evidence of the

accused in conflict with that of the Commonwealth, and regard as true all the credible evidence

favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" *Id.* (quoting

*Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc)).

In May 2022, Newman and Brandon Smith shared an apartment in a gated apartment

complex in Spotsylvania County. Newman and Smith both had a mobile app on their phones that

alerted them when the apartment door opened or closed.[1] On May 2, 2022, Newman and Smith

drove to Florida in Newman's truck for what they intended to be a weeklong trip. During the trip,

Smith received repeated notifications that the apartment door was open. This concerned him

because he "didn't want anyone in the apartment." Although Smith locked the door with the app,

"it kept opening." When Smith asked Newman why the door was opening and closing, she said her

mother and her daughter were "there getting a hamster."

On May 4, Smith and Newman decided to return home. During the drive back from Florida,

Newman stopped at every available rest area. Although Newman typically did not take her phone

into the restroom, on these occasions she did. Newman spent an unusually long time inside the last

rest area they stopped. Smith considered her behavior "weird." The apartment complex's records

showed that Newman's mobile app unlocked the apartment door again at 1:42 p.m. on May 4.

Additionally, when Smith and Newman were an hour from Fredericksburg, Newman said she

---

[1] The apartment complex manager explained that the property was "fully fenced and gated."
He stated that the apartment doors—which were inside secured buildings—had smart deadbolt
locks that residents could open either with a six-digit code or a mobile app.

wanted to go back to North Carolina to visit her mother. So, the two drove back to North Carolina before resuming their drive back to Fredericksburg.

Smith and Newman arrived at the apartment complex in Fredericksburg after 1:00 a.m. on May 5, 2022, and Newman parked her truck in the parking lot. Smith wanted to get a cart to bring all their luggage up to the apartment. Although Newman and Smith had left the last rest area just "seven or eight minutes" earlier, Newman stated that she needed to use the restroom. She suggested that they leave the luggage in the truck and come back later to retrieve it. Smith grabbed one bag, and they entered the apartment building.

Once outside their apartment, Smith noticed nothing unusual about the door and saw nobody in the hall. Newman unlocked the door with the security code and walked to the kitchen.[2] Smith entered after Newman and locked the door behind them. Then, as Smith testified, Newman told Smith that she had to use the bathroom and proceeded to walk directly past a man wearing a ski mask who was standing in their kitchen. The man was holding a black handgun. Smith reached for the firearm, and another assailant struck him with a tire iron. Smith "tussl[ed]" with the gunman, and they fell to the floor. At the same time, the second assailant continued striking Smith with the tire iron. The assailant also punched him, kicked him, and pulled out his hair.

As Smith fought with the assailants, he yelled for Newman to get him his bag, which contained his own firearm. Newman did not give Smith the bag, and instead exited the apartment. The assailant armed with the firearm got Smith "flat on [his] back" and "pinned" him "on the ground." That assailant then passed the gun to his confederate—who was standing—and said to "shoot this [n-word]." As one assailant kept Smith pinned under his body weight, the other assailant repeatedly "cocked" the gun while pointing it at Smith. Smith attempted to use the other

---

[2] The records of the apartment complex showed that the door to the apartment had not been opened since Newman had last unlocked it using the mobile app at 1:42 p.m. on May 4.

assailant to shield himself. Smith also grabbed and "rack[ed]" the firearm, which ejected the chambered bullet.

As Smith struggled with the assailants, a smoke alarm beeped, startling them. Smith shoved them off and ran to the bathroom. The two assailants fled out the front door, taking Smith's phone and bag. Before the attack, Smith's phone was clipped to his front pants pocket. It either "f[ell] off" or "was snatched off" during the assault.

After the attackers fled, Smith locked the front door and went to the balcony. Newman's truck was gone from the parking lot, but Smith saw a man standing by the open door of her Kia sedan. Smith heard the man yell that the police were coming; the assailants then drove away. Smith thought that Newman could have been kidnapped but also that she could have been involved in the robbery.

Smith then left the apartment, and officers responding to the scene encountered him in the hallway. Smith went to the hospital, where he was treated for multiple injuries, including head trauma, a lacerated right temple, a chipped tooth, and a broken right hand. His head injuries required a number of stitches.[3] Newman did not visit him in the hospital.

After Smith was released from the hospital later that day, he obtained a new phone and used an app to locate the stolen phone. The app tracked the stolen phone to an address in Washington, D.C. Smith sent screenshots of the app to Spotsylvania County Detective Horn. When Smith drove to the address where his stolen phone was located, he saw Newman's Kia sedan parked there. Officers subsequently learned that Elijah Cofield—who is Newman's first cousin—lived less than a quarter mile from where the stolen phone was located.

---

[3] At the time of trial, Smith still had a severed nerve on the right side of his face. He also had a scar over his right eyebrow.

Crime scene investigators found a bullet and a tire iron on the floor of Smith's apartment. They also discovered several strips of duct tape stuck to the kitchen counter. A fingerprint lifted from one of the strips matched Cofield.

At Newman's and Cofield's joint trial, Smith acknowledged that he had multiple felony convictions and currently was in custody on narcotics charges. He stated that, at the time of the attack, he earned $200,000 a month from his work in the music industry. Newman knew that Smith had a large amount of cash, which he kept on hand in the apartment. During the Florida trip, Smith took $100,000 in cash to Florida and left $140,000 hidden in the bathroom of the apartment. Smith also testified that he had between $280,000 and $300,000 in a red and black backpack. According to Smith, that backpack was in Newman's truck at the time of the attack, and Newman never returned that money. After the attack, "[a]ll of the things that [Smith] had in the apartment" were gone except for a small amount of clothes and, notably, Newman's daughter's hamster.

Smith testified that he was "sure" that the assailants possessed a "real gun" during the attack because he "got hit with it a couple of times." He averred that, during the attack, the assailants claimed that they knew where his mother and his children lived. One of the assailants also stated: "this is what twenty thousand get you." Smith believed that this statement "meant that somebody gave him twenty thousand dollars to do that." Smith confirmed that he could not identify the assailants and that he had not met Cofield before the attack.

After leaving the apartment during the attack, Newman drove her truck north to Stafford County. The police contacted her and convinced her to return to the apartment complex. The officers seized her phone and performed a data extraction authorized by a search warrant. The extraction showed that Newman made a FaceTime call to an unknown person at 1:54 a.m., and then received an incoming FaceTime call from Cofield's number at 2:03 a.m. on May 5. Her phone made a FaceTime call to Cofield's number at 2:11 a.m. Newman then called 911 at 2:14 a.m.

Immediately after ending the 911 call, Newman made another FaceTime call to Cofield's number. Newman deleted the FaceTime calls to and from Cofield's number from her phone. At 2:37 a.m., Newman also deleted the Snapchat communications app from her phone, which removed records of her Snapchat conversations.

The Commonwealth also introduced cellular site data from Cofield's phone. At 11:39 a.m. on May 4, 2022, Cofield's phone pinged a cell tower in the Washington D.C. area. At 1:16 p.m., it pinged a tower with a coverage area that included Smith and Newman's apartment complex. Cofield's phone did not ping a different tower until 2:14 a.m. on May 5, when it pinged a tower in Stafford County, Virginia. Shortly after 3:00 a.m. on May 5, Cofield's phone entered a coverage area that included his residence in Washington, D.C.

Both defendants moved to strike the evidence. Regarding abduction, Cofield's counsel first argued that the Commonwealth failed to prove that Smith had been detained. Newman's counsel adopted that argument and further asserted that the trial court should strike the evidence of aggravated malicious wounding because the Commonwealth failed to prove that Smith suffered a permanent impairment. The Commonwealth responded that even momentary detention was sufficient to establish abduction and that Smith testified that the assailants pinned him to the ground and he could not get up. Regarding permanent impairment, the Commonwealth pointed to the evidence of Smith's scarring and nerve damage.

Newman's counsel contended that the abduction statute should not be construed to apply to a fight and that assault and battery and brandishing should be separate offenses than abduction. The trial court asked whether "pulling someone down to the ground is more than is necessary for a robbery when someone has got a gun and a tire iron." Newman's counsel responded in the negative.

The trial court denied the motions to strike; neither defendant presented evidence. Cofield's trial counsel made a "pro forma motion to strike . . . based upon identification," asserting that the Commonwealth failed to prove that Cofield "was involved in this attack." Newman's counsel then moved "to strike under the same and adopt[ed] the same reasoning as" Cofield's counsel. The trial court denied the renewed motions to strike.

In its closing argument, the Commonwealth urged the jury to convict Newman of the substantive offenses as a principal in the second degree. The jury convicted Newman on all counts. Newman appeals.

ANALYSIS

Newman contends that the trial court erred in denying her motions to strike the evidence of abduction and use of a firearm in commission of abduction because any detention of Smith was "merely incidental" to robbery and aggravated malicious wounding. She also argues that the Commonwealth failed to prove that she committed the substantive offenses as a principal in the second degree.

I. Abduction

Newman argues that her conviction for abduction must be reversed because the restraint the assailants employed against Smith was "merely incidental" to the restraint employed in their commission of a robbery and aggravated malicious wounding. After review, we disagree. We hold that the restraint employed was beyond what was necessary to complete the necessary elements of robbery and aggravated malicious wounding.

A. Legal Background: Abduction and Crimes Requiring Restraint

Virginia's abduction statute "combines the common law offenses of kidnapping, abduction, and false imprisonment 'into one statutory felony.'" *Clanton*, 53 Va. App. at 567 (quoting *Walker v. Commonwealth*, 47 Va. App. 114, 120 (2005)). "A person is guilty of

- 7 -

abduction if, 'by force, intimidation or deception, and without legal justification or excuse, [he or she] seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty.'"[4] *Brown v. Commonwealth*, 74 Va. App. 721, 730 (2022) (alteration in original) (quoting Code § 18.2-47(A)). "Put simply, the *actus reus* of the crime is a taking, transporting, or detention of another, while the *mens rea* of the crime is a specific intent to deprive another of [his] liberty." *Id.* at 730-31.

"As noted by the Virginia Supreme Court, an abduction generally inheres in a robbery because 'there is usually some detention, and often a seizure, of the victim.'" *Wiggins v. Commonwealth*, 47 Va. App. 173, 180 (2005) (quoting *Scott v. Commonwealth*, 228 Va. 519, 526 (1984)). "To avoid implicating the Double Jeopardy Clause, the Virginia Supreme Court [in *Brown v. Commonwealth*, 230 Va. 310 (1985),] held that the statutory definition of 'abduction' does not encompass 'the kind of restraint which is an intrinsic element of crimes such as rape, robbery, and assault . . . .'" *Id.* (quoting *Brown*, 230 Va. at 314).

Rather, for abduction to constitute a separate offense, any detention must be "separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime." *Brown*, 230 Va. at 314; *see also Jerman v. Dir. of the Dep't of Corr.*, 267 Va. 432, 439 (2004); *Powell v. Commonwealth*, 261 Va. 512, 540-41 (2001); *Cardwell v. Commonwealth*, 248 Va. 501, 511 (1994); *Hoyt v. Commonwealth*, 44 Va. App. 489, 493 (2004). "[W]hether the detention established by the evidence is 'the kind of restraint which is an intrinsic element of crimes such as rape, robbery, and assault,' is a question of law to be determined by the court." *Swezey v. Commonwealth*, 77 Va. App. 809, 815 (2023) (alteration in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 229 (2013)).

---

[4] Abduction committed "with the intent to extort money or pecuniary benefit" is a Class 2 felony. Code § 18.2-48(i).

For the restraint employed by a defendant to be of the "kind . . . which is an *intrinsic element*" of a crime like robbery, it is not enough for the restraint to have been "merely useful to perpetrating the detention-plus crime." *Pryor v. Commonwealth*, 48 Va. App. 1, 5-6 (2006). Instead, the restraint used must have been "necessary" for the defendant to accomplish the elements of the offense. *Lawlor*, 285 Va. at 225. In *Lawlor*, the Supreme Court specified that "[t]he *only issue* when abduction is charged alongside an offense for which detention is an intrinsic element is whether any detention exceeded the *minimum necessary* to complete the required elements of the other offense." *Id.* (emphases added).[5]

We will conduct our review in light of the principles and in light of how these principles have been applied in comparable cases. *See Hoyt*, 44 Va. App. at 496 (restraint was merely incidental to that employed in robbery where defendant held robbery victim at gunpoint and caused him to walk approximately ten feet to a cash register, open the register, place the money in a bag, and hand the bag to the defendant); *Wiggins*, 47 Va. App. at 189-90 (restraint was "greater than that inherent in the underlying robbery" when defendant forced victim to walk a total of thirty-one feet, gave the victim specific instructions, and detained him longer than the detention in *Hoyt*); *Fields v. Commonwealth*, 48 Va. App. 393, 399-400 (2006) (defendant used restraint "in excess of that inherent in the commission of rape and sodomy where he twice choked her to the point of unconsciousness"); *Phoung v. Commonwealth*, 15 Va. App. 457, 459,

---

[5] Pursuant to this Court's decision in *Hoyt*, courts also have the option of considering four factors when useful in assessing whether the restraint employed was "merely incidental" to the restraint inherent in the other crime: "(1) the duration of the detention . . . ; (2) whether the detention . . . occurred during the commission of a separate offense; (3) whether the detention . . . is inherent in the separate offense; and (4) whether the . . . detention created a significant danger to the victim independent of that posed by the separate offense." *Hoyt*, 44 Va. App. at 494. Consideration of these four "*Hoyt* factors," however, is permissive, while consideration of the *Lawlor* "minimum necessary" test is mandatory. *Swezey*, 77 Va. App. at 817 ("the *Hoyt* factors may be considered when helpful").

462 (1992) (restraint was beyond that "inherent in the crime of robbery" when victim's hands and feet were tied together).

## B. Analysis

Applying the mandatory *Lawlor* test, we reject Newman's argument that Smith's detention was merely incidental to either robbery or aggravated malicious wounding.

"Robbery is a common law crime in Virginia. It is defined as 'the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation.'" *Ali v. Commonwealth*, 280 Va. 665, 668 (2010) (quoting *Durham v. Commonwealth*, 214 Va. 166, 168 (1973)). The required violence "need only be slight," and "[a]nything which calls out resistance is sufficient." *Id.* (quoting *Maxwell v. Commonwealth*, 165 Va. 860, 864 (1936)).

"The malicious wounding statute states in relevant part that it is a crime to 'maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill[.]'" *Fletcher v. Commonwealth*, 72 Va. App. 493, 506 (2020) (alteration in original) (quoting Code § 18.2-51)). If the victim is "severely injured" and "suffer[s] permanent and significant physical impairment," the defendant is guilty of aggravated malicious wounding. Code § 18.2-51.2.

First, the trial court did not err in concluding that the restraint applied against Smith "exceeded the minimum necessary to complete the required elements of" robbery. *Lawlor*, 285 Va. at 225. After the intruders had repeatedly struck Smith, including with a tire iron, one intruder used his body weight to force Smith to remain lying on his back. As Smith lay flat on his back, unable to escape, the other intruder pointed a gun at him and repeatedly "cocked" the gun. While some degree of restraint is inherent in a robbery, rendering the robbery victim physically incapable of movement is not strictly necessary to accomplish the required elements

- 10 -

of a robbery. *See id.* This kind of restraint is not of "the kind . . . which is an intrinsic element of [the] crime[] [of] robbery." *Brown*, 230 Va. at 314; *see Phoung*, 15 Va. App. at 459, 462 (reaching the same conclusion regarding the binding of a victim's hands and feet together during the commission of a robbery).

While it would be reasonable to conclude that forcing Smith to remain completely immobile was "useful" to the assailants in their successful perpetration of the robbery, this "mere[] useful[ness]" does not match the legally relevant standard: necessity to accomplish the legally required elements of the crime. *See Pryor*, 48 Va. App. at 6; *Lawlor*, 285 Va. at 225. *See also Fields*, 48 Va. App. at 399-400 (choking victim unconscious was not intrinsic in rape, regardless of whether this action made the rape easier to complete). Therefore, under the mandatory *Lawlor* test, it was not error to conclude that the restraint applied exceeded the minimum necessary to accomplish the elements of a robbery.[6]

Additionally, the trial court did not err in concluding that the restraint that the intruders employed in holding Smith on his back at gunpoint was "separate and apart from, and not merely incidental to" the aggravated malicious wounding of Smith. *Brown*, 230 Va. at 314. By the time that the intruders managed to force Smith to lie flat on his back, they had already struck him multiple times, including with a tire iron. A reasonable factfinder could have concluded that the initial blows that the intruders inflicted, including with the tire iron, were sufficient to complete the aggravated malicious wounding of Smith. *See* Code § 18.2-51.2. For that reason, it was not error for the trial court to determine that the subsequent restraint imposed "exceeded the minimum necessary to complete the required elements" of aggravated malicious wounding. *Swezey*, 77 Va. App. at 817. Because the elements had already been sufficiently established before the

---

[6] Because we have no trouble conducting our review under the mandatory *Lawlor* test, we need not resort to considering the permissive *Hoyt* factors. *See Swezey*, 77 Va. App. at 817.

intruders applied the additional restraint, that restraint cannot have been "necessary" to establishing those elements. *See Brown*, 230 Va. at 314 (detention not of a type inherent in the commission of rape where it was temporally distinct from the rape); *Hoyt*, 44 Va. App. at 494 (considering "whether the detention . . . occurred *during* the commission of a separate offense" (emphasis added)).

For all these reasons, we hold that the trial court did not err in denying Newman's motions to strike with regard to her simultaneous convictions for abduction and robbery, and simultaneous convictions for abduction and aggravated malicious wounding.[7]

## II. Principal in the Second Degree

Newman also contends that "the Commonwealth failed to prove that she was involved in the attack" on Smith as "a principal in the second degree."[8] She argues that the Commonwealth failed to prove that that she participated in planning or had prior knowledge of the attack. We disagree and hold that the evidence was sufficient to support Newman's conviction beyond a reasonable doubt as a principal in the second degree of the relevant offenses.

## A: Standard of Review and Applicable Law

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a

---

[7] Because of our holding, we need not reach the Commonwealth's alternative argument, on brief, that the evidence was sufficient to support Newman's conviction of abduction under the theory of abduction by deception.

[8] Newman does not argue that the Commonwealth's evidence was insufficient to establish the three conspiracy offenses.

- 12 -

reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Instead, we ask only 'whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Secret*, 296 Va. at 228). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Id.* (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). When a conviction is reached on the basis of circumstantial evidence, the question on appeal is whether it was "plainly wrong" for the factfinder to conclude that "the evidence excludes all reasonable hypotheses of innocence." *Young v. Commonwealth*, 70 Va. App. 646, 654 (2019). And "[w]hile no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Pijor v. Commonwealth*, 294 Va. 502, 512-13 (2017) (second alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

In Virginia, a "principal in the second degree . . . may be indicted, tried, convicted and punished in all respects as if a principal in the first degree." Code § 18.2-18. While a "principal in the first degree is the actual perpetrator of the crime," a "principal in the second degree" is "one who is present" at the crime while "assisting the [principal actor] in the commission of the crime." *McAlevy v. Commonwealth*, 44 Va. App. 318, 323 n.5 (2004) (quoting *Hall v. Commonwealth*, 8 Va. App. 526, 530 (1989)). This means that two things must be shown for a conviction as a principal in the second degree: that the defendant was present at the scene of the crime and that she lent aid by "commit[ting] some overt act, such as inciting, encouraging, advising, or assisting in the commission of the crime, or [that she] share[d] the perpetrator's criminal intent." *Hampton v. Commonwealth*, 32 Va. App. 644, 648 (2000). While "[m]ere presence during the commission of a crime and subsequent flight" are insufficient for a

conviction as a principal in the second degree, "[e]very person who is present at the commission of a [crime], encouraging or inciting . . . by words, gestures, looks, or signs, or who in any way, or by any means, countenances or approves the same is, in law, assumed to be an aider and abettor, and is liable as principal." *Moehring v. Commonwealth*, 223 Va. 564, 567 (1982); *Dunn v. Commonwealth*, 52 Va. App. 611, 617 (2008) (en banc) (second alteration in original) (quoting *Foster v. Commonwealth*, 179 Va. 96, 99 (1942)).

## B: Analysis

Reviewing Newman's appeal, we ask whether a rational factfinder could have concluded beyond a reasonable doubt that Newman acted as a principal in the second degree in the attack on Smith. In analyzing this question, we review the evidence in the light most favorable to the Commonwealth and grant it all reasonable inferences therefrom. *See Clanton*, 53 Va. App. at 564 (quoting *Hudson*, 265 Va. at 514). Viewed in this light, the evidence established a number of circumstances that, cumulatively, were sufficient to permit a rational factfinder to exclude all reasonable hypotheses of innocence and conclude beyond a reasonable doubt that Newman acted as a principal in the second degree in the crimes. *See Young*, 70 Va. App. at 654.

First, the evidence indicated that upon Newman's entry of the apartment, Newman walked directly past an intruder who was wearing a ski mask and holding a gun. Additionally, while Smith was being attacked, Newman did not respond to his calls for help and left the apartment rather than passing Smith his bag, which contained a gun. A reasonable factfinder could have placed significant weight on these circumstances in assessing the likelihood that Newman was a part of the scheme to rob, abduct, and maliciously wound Smith.

Additionally, numerous actions taken by Newman before the commission of the crimes provided significant additional evidence that a reasonable factfinder could have considered in assessing the likelihood that Newman was involved in planning and facilitating the crime. First,

in the days leading up to the crime, Newman repeatedly used an application to remotely unlock the door to her and Smith's apartment. During that same timeframe, intruders stole almost all of Smith's belongings from the apartment. In particular, Newman remotely unlocked the door to the apartment at around the time when the phone possessed by Cofield—who was tied to the crime by DNA and geolocation evidence—showed that he had arrived in the area of the apartment on May 4. And when questioned, Newman gave Smith a false explanation for having opened the door. Newman's mother and daughter did not, as she had claimed, come in to retrieve a hamster from Smith and Newman's apartment.

Second, upon Newman and Smith's return to Fredericksburg, Newman took numerous actions that were unusual for her and that slowed them down: Newman stopped to use the restroom with unusual frequency, brought her phone with her, which was unusual for her, and remained in the restroom for an unusually long amount of time. And, when she and Smith were only an hour from their destination in Fredericksburg, Newman rerouted them again, deciding that she wanted to drive back to North Carolina to visit her mother. Third, when Smith and Newman arrived at their apartment, Newman asked Smith to enter the apartment quickly rather than taking the time to bring in his luggage so that she could use the bathroom, despite her just having used the restroom seven or eight minutes before. When Newman drove away from the crime scene, as Smith was being beaten and robbed upstairs, she took her truck, which contained the bags that she had encouraged him to leave behind.

Finally, the evidence of Newman's actions after the crime added additional circumstances that a rational factfinder could have considered probative of Newman's guilt. The evidence showed that Newman communicated with Cofield by FaceTime immediately after the crime. And it showed that Newman deleted the record of these communications, as well as the record of any Snapchat messages she had exchanged.

The circumstantial evidence that Newman helped plan and carry out the crimes against Smith was, collectively, sufficient for a reasonable factfinder to conclude Newman's guilt beyond a reasonable doubt. To conclude otherwise would require believing, among other things, that Newman had other, unrelated reasons to be lying to Smith about why she was repeatedly unlocking the apartment door at around the time when intruders were stealing items from their apartment, that Newman did not see the masked gunman that she walked directly past in the small kitchen area upon her return to the apartment, and that she communicated with—and attempted to hide her communications with—another person forensically tied to the crime for reasons other than her own culpability. "While no single piece of evidence" presented by the Commonwealth may have, by itself, been sufficient to support the conclusion that Newman was guilty beyond a reasonable doubt in this case, "the combined force of many concurrent and related circumstances" presented in this case were sufficient to "lead a reasonable mind irresistibly to [that] conclusion." *Pijor*, 294 Va. at 512-13 (quoting *Muhammad*, 269 Va. at 479). Given the many pieces of interlocking circumstantial evidence against Newman, it was not plainly wrong for the factfinder to conclude beyond a reasonable doubt that Newman shared the criminal intent of Smith's assailants and that she assisted in the crimes by letting the intruders into the apartment and bringing Smith to the location where he would be attacked at the optimal moment. Therefore, it was not plainly wrong for the factfinder to conclude that Newman's hypothesis of innocence was unreasonable.

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*